YAZOO & M. V. R. R. Co. *v.* NICHOLS & Co.

[83 South. 5, In Banc.   No. 207795.]

1. CARRIERS. *Construction of bill of lading against carrier.*
If there is a reasonable doubt as to the true interpretation to be given a bill of lading the courts are justified in construing the contract more strongly against the carrier.

2. EVIDENCE. *Judicial notice that consignees do not know of arrival of freight.*
The court will take judicial notice of the fact that consignees do not and cannot know the exact time of the arrival of freight, consigned to a particular station or siding, and frequently have to be notified by a local agent of the arrival and placing of cars.

3. CARRIERS. *Acceptances of freight evidenced by bill of lading.*
Prima-facie the issuance of a bill of lading by a carrier is an acceptance of the freight.

4. CARRIER. *Liability for loss of shipment as affected by uniform bill of lading.*
Under the facts in this case as set out in its opinion the court held that a shipper of a carload of cotton, who delivered to the railroad in a car placed on a side track at a point where the

road maintained a regular freight agent, was entitled to recover for the loss of the cotton by fire, notwithstanding a provision of the bill of lading that property destined to or delivered from a station where there was no regular agent, when received from or delivered on private or other sidings, should be at the owner's risk until the cars were attached to, and after they were detached from, trains.

Appeal from the circuit court of Coahoma county.
Hon. W. A. Alcorn, Jr.; Judge.
Suit by Nichols & Company against the Yazoo & Mississippi Valley Railroad Company. From a judgment for plaintiff, defendant appeals.
The facts are fully stated in the opinion of the court.

*Clinton H. McKay,* for appellant.

(1)   As to interstate shipments, a common carrier may limit its common-law liability by reasonable stipulation, except as to loss or damage due to its own negligence or that of its servants, and its power to do so is not abridged by the Carmack Amentment, as amended. *York Mfg. Co.* v. *Illinois Central R. Co.,* 3 Wall. 107, 18 L. Ed. 170; *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 51 L. Ed. 321; *Kansas City S. R. Co.* v. *Carl,* 227 U. S. 639, 57 L. Ed. 683; *Boston & M. R. Co.* v. *Hooker,* 223 U. S. 97, 58 L. Ed. 868; *Southern Ry. Co.* v. *Prescott,* 240 U. S. 632, 60 L. Ed. 836; *C. N. O. & T. P. Ry. Co.* v. *Rankin,* 241 U. S. 319, 60 L. Ed. 1022; *Erie R. Co.* v. *Stone,* 244 U. S. 332, 61 L. Ed. 1173; *So. Pac. Co.* v. *Stewart,* Adv. Sheets, U. S. Sup. Ct. Feb. 15, 1919, page 176.
(2)   The shipment being interstate, the rights and liabilities of the parties "depend upon Acts of Congress, the bill of lading, and the common-law rules as eccepted and applied in Federal tribunals." *C. N. O. & T. P. Ry. Co.* v. *Rankin,* 241 U. S. 319, 60 L. Ed. 1022; *Erie R. Co.* v. *Stone,* 244 U. S. 332, 61 L. Ed. 1173.

(3)   A shipper and carrier may lawfully contract so
as to postpone the time when the liability of the car-
rier as an insurrer shall attach, and in such case, for
loss occurring after the bill of lading is issued, but be-
fore the time fixed for the liability as insurer to begin,
the carrier will not be responshible, unless such loss is
due to its negligence. *Washburn-Crosby Co.* v. *Johnson
Co.*, 125 Fed. 273; *Brainbridge Groc. Co.* v. *A. C. L. R.
R. Co.*, 8 Ga., App. 677, 70 S. E. 174; *Siebert* v. *Erie R.
Co.*, 163 N. Y. Supp. 111; *Bers* v. *Erie R. Co.*, 163 N. Y.
upp. 144 S. C., 122 N. E. 456; *Standard Combed Thread
Co.* v. *Pennsylvania R. Co.*, 95 Atl. (N. J.) 1002, L. R.
A. 1916C, 606.

(4)   The phrase 2 ''Private or other sidings'' in sec-
tion 5 of the bill of lading contemplates and includes
a side-trask of the kind involved in the case at bar *Brain-
bridge Grovery Co.* v. *A. C. L. R. Co.*, 8 Ga. App. 677,
70 S. E. 174; *Siebert* v. *Erie R. Co.*, 163 N. Y. Supp.
111; *Bers* v. *Erie R. Co.*, 163 N. Y. Supp, 144; S. C.
122 N. E. 456; *tandard Combined Thread Co.* v. *Penn-
slyvania R. Co.*, 95 Atl. (N. J.) 1002, L. R. A. 1916-C
606.

(5) At common law, as interpreted and applied in fed-
eral tribunals, a carrier may lawfully conrtact for exemp-
tion from liability, except as against negligence. *Mfg.
Co.* v. *Illinois C. R. Co.*, 3 Wall. 107, 18 L. Ed. 170; *Cau
v Railroad Co.*, 194 U S. 432, 48 L. Ed. 1057.

(6)   A stipulation in a bill of lading exempting the
carrier from liability for loss or damage, will be limited
by judicial construction to loss or damages not proxi-
mately due to its negligence.   It is not necessary that
the stipulation contain express words so limiting this
application.  Such words of limitation will be implied by
the usual rules of judicial construction. - *Washburn-
Crosby Co.* v. *Johnston Co.*, 125 Fed. 273; *Bank* v.
*Adams Express Co.*, 93 U. S. 174, 23 L. Ed. 872; *Ins Co.*
v. *Compress Co.*, 133 U. S. 387, 33 L. Ed. 730; *Com-*

*pania, etc.* v. *Breauer,* 168 U. S. 104, 42 L. Ed. 398.

(7)   The delay, if any in moving the car from the side track where loaded, even though resulting from defendant's negligence was not the proximate, but only a remote cause, of the loss by fire, and such delay does not render the carrier liable. *Railroad Co.* v. *Reever,* 10 Wall. 176, 19 L. Ed. 909; *Cau* v. *Railroad Co.,* 104 U. S. 427, 48 L. Ed. 1053; *Millsaps* v. *Railroad* Co., 76 Miss. 855:

(8)   Extracts from the tariffs and classifications of defendant made public records by the filling thereof with Interstate Commerce Commission under section 16 of the Act to regulate commerce as amended, when certified by the secretary, under the commissions seal, are receivable in evidence with like effect as the originals, to prove defendants, schedule of rates, and the rules and regulations applicable in connection therewith, and it was error to exclude the same when offered by defendant to show that it had established alternate rates, for the transportation in question, the lower of which applies only when the shiper accepted the terms and conditions of defendant's bill of lading.

Act to Regulate Commerce, as amended, Section 16; U. C. Comp. Stat., 1916. Vol. 8, section 8584, sub-sec. 12.

*J. W. Cutrer* for appellee.

The paragraph in the uniform bill of lading relied upon by appellant has application only to those stations at which there is no regularly appointed agent: Because this brief is largely taken up with a discussion of the paragraph above quoted from the uniform bill of lading and because it is well to keep in mind the exact provision of that paragraph, we insert again that paragraph here:

''Property destined to or taken from a station, wharf or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloaded

from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves, or landings shall be at owner's risk until the cars are attached to and after they are detached from trains."

The proposition as set forth in the first point relied upon by the appellees in his brief has been expressly held by the California court in the case of *Jolly* v. *Atcherson, Topeka & San Francisco Railroad Co.*, 131 Pac. 1057, 21 Cal. App. 368.

There the court, in discussing this same provision of the uniform bill of lading, and in a case where the carrier sought to escape liability upon practically the same plea which they are now urging upon this court, said: "A bill of lading providing that property destined to a station at which there is no regularly appointed agent shall be entirely at the risk of the owner when handled from cars or until loaded into cars, and when received from or delivered on private or other sidings shall be at the owner's risk until the cars are attached to and after they are detached from trains only applies to deliveries at stations where there are no regularly appointed agents."

This case commends itself to us because of its reasonableness and we earnestly submit that the California court's interpretation of the paragraph in question is correct.

The sidetrack upon which the car of cotton in question was loaded was not a "private siding" within the meaning of the provisions of the bill of lading. To state this proposition, and to refer most casually to the contract under the terms of which this tract was constructed is to prove it. Appellant urges that because this track was constructed upon property not owned by it, and because it was convenient for shippers to use, that it was a "private siding." It seems to us that it would be equally as reasonable to say that had appel-

lant constructed its main line of tracks over property not owned by it and had these tracks been convenient to the public in general, then the Y. & M. V. Railroad Company would be a private railroad.

Referring, however, to the contract, it is expressly provided therein that: "It is understood and agreed that the party of the first part shall be the owner of, and have sole control of, the said spur or sidetrack, and all material used in its construction, and that the same shall remain personalty and shall not become a part of the realty, and that it shall have the right at any time in its discretion to abandon the use of the said track, and to take up and remove the said track notice shall be given to the party of the second part thirty days before the removal of the same shall be commenced."

How in the light of the foregoing paragraph of the contract, the contention of appellant that this is a private side track can be upheld we are unable to conceive. Appellant had quite the same control over this track that it did over its main line. It constructed it, repaired it, owned it and operated it. Where is there anything private about that? We submit that there are no grounds whatever for the contention of appellant; appellant points out the fact that neither Mr. Rainer nor Mr. Parks, the successive owners of the gin, ever objected to the use of the sidetrack, by the company for purposes other than private ones. What bearing this could have upon this controversy in the light of the contract to the use to which this track was being put—could they have possibly won their contention in the light of the following provision of Mr. Rainer's contract with appellant?

"1. The party of the second part hereby agrees to furnish, free of cost, to the party of the first party, all of the ground needed for the construction, use and maintenance of the said spur of sidetrack, so far as the same shall extend beyond the right of way and grounds of the

party of the first part, and to give the party of the first part secure exclusive possession, and the quiet and peaceable enjoyment thereof, so long as this agreement shall continue in force."

So we submit there can be no possible weight to appellant's contention that this is a private siding, within the terms of the bill of lading. The sidetrack upon which the loss occurred is not one, such as is contemplated in the phrase "or other siding" as it appears from the quotation from the bill of lading.

The opposite to the foregoing is what counsel for appellant in his brief places great confidence upon. Appellant contends here, as it did in the lower court that, if the given sidetrack is not a private one, then necessarily it is a public one and therefore within the contemplation of the provision of the bill of lading when the words "or other sidings" are used.

Appellant cites and relies upon the following cases in support of this contention: *Standard Combed Thread Co. v. Penn. Company,* 95 Atl. (N. J.) 1002, L. R. A. 1916C, 606; *Siebert* v. *Erie Railroad Company,* 163 N. W. Sup. 111; *Bers et al.* v. *Erie Railroad,* 163 N. Y. Supp. 114; *McClure* v. *N. W. Railroad,*——S. E. 515 (W. Va.); *Bianchi* v. *Montpelier Railroad,* 104 Atl.——

Of all these cases we have the full reports of only two, to wit, Standard Combed Thread Co., etc, and *Bers* v. *Erie Railroad Company.* We have read, however, the other cases and none of them support appellant's contention, but on the other hand we think all of them are authority for the stand we take in this case. We will take occasion to further examine the cases which we do not have at present and will submit a supplemental brief in which we will attempt to demonstrate the position as above set forth.

At the common law and before the enactment of the Carmack Amendment the liability of a carrier, as an insurer, attached when complete delivery had been effect-

– ed that is to say when nothing more remained to be done by the shipper in order for the shipment to be started upon its journey. This has been expressly held by our court in the case of *Tate* v. *Railroad Company,* 78 Miss. 842, 29 So. 392, 84 Am. St. Rep. 649.

This rule of the common law, as appellant contends has been changed by the stipulation in the uniform bill of lading which we now have under discussion, and as above stated, appellant relies upon several cases in support of its contention. In view of the facts that all of these cases upon which appellant rely were decided upon the peculiar facts of each case, we think it would be best to recur to the facts and circumstances effecting the particular sidetrack upon which the loss occurred out of which arises this controversy. It was owned absolutely by the appellant company; appellant built it, repaired it, controlled and operated it. Its *terminus* was within sixty feet of appellant's depot. It was the only sidetrack in Alligator which could be used for loading and unloading carload lots of freight. It was what is known as a "team track." Upon it fifty to seventy-five percent of all carload lots of freight was handled. Without its general use by the public, appellant would have been utterly incapable of handling its business. We repeat these facts because we think it would be well to keep them in mind while we discuss the cases relied upon by the appellant. The first case cited by appellant is that of *Standard Combed Thread Company* v. *Penn Company, supra.* In that case the sidetrack was one-half mile away from defendant's station "and the custom was for plaintiff to telephone for a car when needed to defendant's freight agent at the station and a car would be placed and the shipper allowed forty-eight hours to load it. When defendant was notified the car was loaded, it would be moved by defendant to the freight station or its immediate vicinity. The doors would be sealed and a bill of lading would be issued. Until such

sealing, the doors remained unfastened.'' The court also, upon the peculiar facts of that case, decided that there was no complete delivery and therefore could thereunder no theory of the law, be any liability upon the defendant company; therefore anything that the court said with reference to the construction of the paragraph of the uniform bill of lading was *obiter dictum.*

Recurring to the facts of the case, this case can have no application here because freight was not ordinarily received upon that sidetrack, but when the car was loaded it would be moved from the track to a point nearer the depot of the defendant company and there sealed and bill of lading issued. In other words it was contemplated by both parties and perfectly well understood that delivery would be completed at an altogether different place . In the case at bar, it was the unbroken custom for the appellant to recieve and deliver freight from the track upon which the loss occurred. Appellant acted no differently with reference to shipments received upon this track than with reference to shipments placed in its own ware-house. Another salient fact that we have no doubt had great weight with the court in the *Standard Combed Thread Company case, supra,* was the fact that no bill of lading was ever actually issued. In view of this fact we again submit that anything the court said in interpreting the uniform bill of lading was *obiter dicta* because it does not appear from the evidence that the shipper would not have chosen to have the ten per cent higher rate and thereby placed the defendant company upon its common-law liability. In the case the Railroad Company would have been liable had there been a delivery completed, but inasmuch as there was no delivery there could be no liability.

Therefore we submit that this case is not authority for the proposition relied upon by the appellant. To the case in L. R. A. above discussed there is an extended note upon what constitutes delivery to a carrier, and in

the note there are collected cases which deal with the question of whether or not delivery can be effected upon sidetracks similar to the one in question. All of these cases so hold. See L. R. A. 1916 C., 608-10.

We now come to the discussion of the *Bers v. Erie Railroad Case,* 122 N. E. 456. This case was decided by the appellant devision. There was a very strong dissenting opinion concurred in by two of the justices which very clearly and succinctly state some of the propositions for which we here contend. Unfortunately we will have to refer more fully to this report of the case in a supplemental brief of the case when we have the case before us in full.

Justice BOUND in his opinion in the case in the court of appeals in discussing the phrase "other sidings" says: "Appellant contends that it is not a "private or other siding." The majority of the court below held that the phrase in the bill of lading included within its terms all sidings, whether public or private. That meaning would be more clearly expressed by the use of the words "all sidings" and a good rule of construction suggests that the words "or other" following the word "private" include not all sidings but only sidings like "private sidings."

If this be the correct explanation of the words "other sidings" then we submit that the sidetrack in this case cannot come within the stipulation. This was not a siding like a "private siding" but one in all respects similar to the most public one owned by the appellant. It was used by the appellant in most of its carload business for the town of Alligator as a "team track." Not as one built for the purpose of serving one industry or even a number of industries. The court further said in the *Bers Case, supra,* in differentiating the siding in that case from other sidings owned by railroads and operated by them for purposes different from the purposes for which the siding in that case was constructed to serve:

"It was not a private siding. Private sidings include mainly those which are owned or maintained by shippers for the purpose of connecting their factories and warehouses with the tracks. They thus provide themselves with conveniences which the railroad fails to furnish. It was a public siding, open to the use of the shipping public in general, for the loading and unloading of cars, like the freight station and yards. It was not a part of the railroad terminal or freight station. It was separated therefrom as effectively as if the warehouse had been five miles from the freight depot. It was an industrial switch, a facility for the use and convenience of the shippers whose warehouses were adjacent thereto. It was like a private siding in all respects except that the carrier owned it. These shippers were fortunate enough to have the advantages of a private siding without the burden of private ownership. So it is we contend that this case is authority for us.

Appellant excepts to the action of the court in excluding certain certified excerpts from its rate sheets, and insists that the exclusion thereof was manifestly error upon the part of the court.

Although we submit and urge that the action of the court was not error, we also contend that the acts of the court can have no bearing whatever upon this appeal because in discussing the terms of the uniform bill of lading we have necessarily admitted the competency and truth of the proof which the certified excerpts from the rate sheets of appellant would go to show. Therefore we cannot see where the exclusion of this evidence can effect the court in its decision upon this appeal.

Stevens, J., delivered the opinion of the court.

Appellees as plaintiffs in the trial court sued to recover the value of thirty-one bales of cotton delivered by them to appellant railway company at Alligator, Missis-

sippi, to be transported and delivered to Godlett & Co., Memphis, Tennessee. The record shows that W. B. and F. M. Nichols are partners in the cotton planting business and annually shipped their cotton over the lines of the defendant company, the only railroad company doing business at Alligator. Appellees, the owners of the cotton sued for, had their cotton ginned at Parks' gin at Alligator. On the 2d day of November, 1917, they made application for a car, and on the morning of Saturday, November 3d, the car was placed and about noon of the same day loaded with the thirty-one bales of cotton. Plaintiffs procured a bill of lading from the agent at 1:30 p. m., and thereafter considered the cotton delivered to the carrier. The car was placed and the cotton was loaded upon a sidetrack which leaves the main line of the railroad company about sixty feet south of the depot platform and runs in a southeastward direction along by Parks' gin, approximately a distance of about one thousand feet. This sidetrack was originally constructed by appellant company under a written contract with Mr. J. C. Rainer, former owner of the gin. The contract is in evidence, bears date October 14, 1901, and provides, in brief, that Mr. Rainer should furnish the right of way, and that appellant would lay and construct the track and furnish all needed material and thereafter be the owner of the track with the right to take up and remove the same, and that appellant furthermore is to have the "exclusive possession and the quiet and peaceable enjoyment thereof" as long as the agreement should be in force. It appears that this gin track and one other track, refered to in the record as the "house track," extending alongside the freighthouse, were for many years the only tracks in the town of Alligator. Subsequently another track was constructed down by the gin of one Kline.

There is evidence tending to prove that the Parks gin track and the railway company's house along the depot

furnished the facilities for handling incoming and outgoing freight, and that between fifty and seventy-five per cent. of all carload shipments were handled on the sidetrack leading by Parks' gin; that the shipping public used the gin track, and to this end a track scale was placed on this gin track. Appellees had no proprietary interest either in the gin or the sidetrack upon which their cotton in question was loaded. The evidence further tends to show that the gin platforms held most of the cotton, and that it was from the gin platforms that most of the cotton in Alligator was shipped. Parks' gin is a public gin, and the agent of the defendant company would honor the requisition of any shipper who desired to load or unload cotton at this gin. The carload of cotton sued for was destroyed by fire about four o'clock p. m. on Sunday, the day following the issuance of the bill of lading. There is evidence that local freight train headed north passed Alligator between three and four o'clock Saturday afternoon after the signing and delivery of the bill of lading; but the evidence further tends to show that the local agent was busy in and about his duties, and for that reason did not arrange to have the car pulled out and attached to that regular train. The fire originated in the gin, but the evidence fails to show how or by whom it was started. It is fair to assume that the fire originated through no fault of either party to this suit. It spread rapidly to the cotton platform, was communicated to the loaded car, and the car and its contents were burned. There is evidence as to the efforts made by both parties to move the car to a place of safety and avert a loss, but the view which we take of the whole case renders it unnecessary to detail this testimony.

The uniform bill of lading was issued in this case and, amoung other provisions, contains the following paragraph: "Property destined to or taken from a station, wharf or landing at which there is no regularly appoint-

ed agent shall be entirely at risk of owner after unloaded from cars or vessels, and when received from or delivered on private or other sidings, wharves or landings shall be at owner's risk until the cars are attached to and after they are detached from trains.''

There is no dispute as to the amount or value of the cotton sued for. The circuit judge instructed the jury peremptorily to find for the plaintiff for the value of the cotton, as also the sum of ninety-one dollars and forty-four cents freight, and, from the judgment rendered in pursuance thereof, this appeal was prosecuted.

On behalf of appellant, it is contended in the main that the quoted stipulation in the bill of lading is valid and binding, is supported by a valuable consideration, and provides a reasonable limitation of the carrier's liability in the premises; that the sidetrack upon which the car was loaded is embraced in the phrase "private or other sidings" in section 5 of the bill of lading; that the track was a private siding within the meaning of the phrase, but, if appellant is mistaken in this, that the phrase is broad enough to cover this case.

For appellees it is contended that the quoted provision of the bill of lading has application only to those stations at which there is no regularly appointed agent; but, if mistaken in this, appellees contend that the sidetrack is not one contemplated by the phrase "private of other sidings," but in fact was a part of the terminal facilities of appellant company at the small station of Alligator.

It affirmatively appears that the defendant maintained at Alligator a regular freight agent, and that most of the carload shipments were received from the siding in question. Whatever differences may exist as to the construction to be placed upon the quoted provision in the bill of lading, we prefer and adopt as the more reasonable view the construction which the supreme courts of California and West Virginia have placed upon this paragraph in the uniform bill of lading. *Jolly* v. *A., T.*

*& S. F. Railway Co.,* 21 Cal. App. 368, 131 Pac. 1057; *McClure* v. *Norfolk & W. Railway Co.* (W. Va.), 98 S. E. 514. Under this view the paragraph should be construed as a whole, and the phrase "at which there is no regularly appointed agent" should be held to qualify the last clause as well as. the first clause of the provision. If there is a reasonable doubt as˚to the true interpretation to be given this clause of the bill of lading, we are justified in construing the contract more strongly against the defendant. It will be observed that the paragraph is written and must be read as a whole, and that the word "property," the first word used, is the subject . of the entire paragraph; that the so-called "last clause" of the provision is separated from the first by a comma, and by proper grammatical construction this last clause, in reference to property received or delivered on private or other sidings, wharves, or landings, has application only to those places where there is no regularly appointed agent. As well stated by the supreme court of West Virginia in the McClure Case:

"The terms, 'private or other sidings,' in the last clause, necessarily means private or public sidings, because all railroad sidings fall in one or the other class."

The word "private" in contradistinguished from "public." It is difficult to conceive of a siding that might be termed semiprivate or *quasi* private. The entire provision is designed to release carriers from liability at all places where there is no regularly constituted agents until the property has been received into . the actual as distinguished from the constructive possession of the carrier and when delivered out of the actual possession of the railroad .companies at such points. The first stipulation is to the effect that property taken from a station, wharf, or landing at which there is no regularly appointed agent˚is at owner's risk until loaded upon cars, regardless of whether such property is received on a main or sidetrack, and further-

more, if received at private or other sidings in carload lots, the same is at owner's risk at all places where there is no regularly appointed agent until the cars are attached to trains. Heavy freight, such as cotton and lumber, and indeed the greater portion of freight shipped in carloads, must be received on sidings of some nature. The wholesale business of the nation is handled from sidetracks, whether they be termed industrial switches, team tracks, or sidings. If then appellant's contention on this appeal is the true one, interstate carriers have successfully relieved themselves of all responsibility for theft, fire, or damage to the bulk of the freight handled in carload shipments, except only when regular trains have been made up for regular movements between stations, and furthermore under such view a large per cent. of the shipping public, having no proprietary interest in sidings and no opportunity to protect carload shipments consigned by or to them, are without protection. The quoted provision refers as much to property delivered on "private or other sidings" as property received. It is a matter of common observation that consignees do not know, and cannot know, the exact time of arrival of freight consigned at a particular station or siding, and frequently have to be notified by a local agent of the arrival and placing of the car. If the mere placing of a consigned car on a side track exempts the carrier from further liability, then railroad companies have an easy way of discharging their common-law duty safely to transport and deliver freight.

In the present case, the testimony shows that appellees have no proprietary interest in the gin track, and therefore had no control over the car after it had been loaded and the bill of lading issued. *Prima facie* the issuance of a bill of lading is an acceptance of the freight, and upon, receiving the bill of lading under circumstances disclosed by the present record, the shipper

would ordinarily go about his business and leave the protection of the car to the carrier. But there are many instances where railroad companies in an honest effort to serve the public agree to receive, or take up, and to deliver freight at flag stations and at other points on the main line where there is no regularly appointed agent and sometimes upon sidings where there is no agent. At such places it is reasonable for the carrier to limit its liability for property received or delivered in accordance with what we believe to be the proper construction of the bill of lading here under review. As stated by the supreme court of West Virginia:

"There is as much, if not more, danger that property not loaded into cars would be destroyed or carried away, than there is after it has been loaded, and therefore no reason for making the distinction contended for by counsel for defendant in the application of the provision."

*Affirmed.*